IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **ALISSA AKINS,**<br><br>       **Plaintiff,**<br><br>  v.<br><br>**APPRAISAL INSTITUTE, an Illinois not-for-profit corporation**<br><br>       **Defendant.** | **Case No. _____** |

## COMPLAINT

  Plaintiff Alissa Akins, through here undersigned attorneys, and for her complaint against Defendant Appraisal Institute, hereby alleges as follows:

### Nature of Action

  1. Plaintiff was terminated from her job for reporting and refusing to participate in an ongoing fraud being committed by her employer. The fraud was occurring against both individual consumers and multiple state regulatory authorities, including the Illinois Department of Financial and Professional Regulation.

  2. Plaintiff discovered that Defendant Appraisal Institute ("AI") has been knowingly reporting inaccurate exam scores to state agencies. These exams were taken by applicants seeking to be licensed real estate appraisers and those licensees who needed to take exams to maintain their license. Some consumers who passed the exam were told they failed. Some consumers who failed were told they passed. Consumers and state agencies relied upon the results. While AI is a non-profit, consumers paid for each examination.

3. When Plaintiff discovered that this conduct had been ongoing for many years, she reported it to her superiors and set out a plan to bring AI into compliance and put an end to the fraudulent activity. When AI refused to take action or make any of the suggested improvements, she demanded that her signature be removed from the certificates evidencing successful completion of a course, including passing the course exam.

4. In retaliation, Plaintiff was first told that if she did not leave, then they would "make [her] life hell." When Plaintiff refused to voluntarily resign, she was terminated.

## The Parties

5. Plaintiff Alissa Akins ("Akins") is a citizen of the State of Maryland, residing in Baltimore, Maryland.

6. Defendant Appraisal Institute ("AI") is an Illinois not-for-profit corporation with its principal place of business at 200 West Madison, Suite 2000, Chicago Illinois 60606.

## Jurisdiction and Venue

7. Subject matter jurisdiction is proper in this District pursuant to 28 U.S.C. §1332(a). The amount in controversy exceeds $75,000 and the parties are citizens of different states.

8. Venue in this District is also proper pursuant to 28 U.S.C. §1391(b) because a substantial part of the events giving rise to the claims herein occurred in this District.

## AI's Role In Administering Appraisal Exams

9. In 1989, the U.S. Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"). Under FIRREA, the Appraiser Qualifications Board ("AQB") establishes the minimum education, experience, and examination requirements for real property appraisers to obtain and maintain their state license or certification. In addition, individual states have their own requirements based upon the AQB standards.

10. Defendant AI promotes itself as the "leading professional association of real estate appraisers" and "home to the largest group of real property valuers in the United States." AI states that it has a "global professional association of real estate appraisers, with approximately 16,000 professionals in almost 50 countries throughout the world."

11. AI acts as a third-party vendor, administering exams that are used by state regulatory authorities in determining whether appraisers, trainees and applicants have complied with the AQB and state-specific standards for educational requirements.

12. As a third-party administrator, AI provides educational courses and administers exams in connection with those courses.

13. The exams administered by AI include qualifying education exams, continuing education exams, and the Uniform Standards of Professional Appraisal Practice (USPAP) exam.

14. Students pay AI a fee for the course and the exams.

15. Depending on the state, AI transmits information about the student's performance on the exams to the student, the appropriate state regulatory authority, or both.

16. If a student fails an exam and wants to retake it, the student must pay another fee.

17. State regulators rely on the information provided by AI to determine if an individual has complied with necessary licensing and certification requirements.

18. AI transmits information concerning student exam results across state lines via emails and the internet.

19. AI offers courses and exams for 52 jurisdictions.

**Plaintiff's Discovery of AI's Fraud**

20. Plaintiff is an experienced non-profit executive with a national reputation who has led and developed training and continuing education programs.

21. Given Plaintiff's experience and reputation, AI approached her about a position.

22. AI hired Plaintiff in February of 2024 as their Director of Education and Publications.

23. Less than a year into her tenure, an instructor for one of AI's courses notified Plaintiff's team of a potential error in one of the exams.

24. In September of 2024, Plaintiff and her team began investigating the potential error.

25. The results of Plaintiff's investigation were deeply disturbing and included the following findings:

26. Inaccurate Qualifying Education and Continuing Education Exam Scores.

    a) Plaintiff discovered that, between 2020 and 2024 consistent misreporting of scores was occurring.

    b) Some students were told they passed the qualifying education and continuing education exams when, in fact, they had failed. Because completing courses and passing course exams was a necessary condition for licensing and recertification, the misreporting has caused state regulators to license and recertify individuals who did not meet the minimum standards.

    c) Other students were told they had failed the exam, when they had actually passed. Some of these students often had to retake the exam and pay an additional fee.

    d) The incorrect results were all reported to the students and/or the state regulatory authorities.

    e) Plaintiff and her team rescored a subset of approximately 300 of the suspect exams to determine the correct scores, but as set forth below, she was instructed not to take any further action on the corrected scores.

27. Inaccurate Minimum Passing Scores.

a) Different states have different minimum scores required to be licensed in that state. Despite the State's having different standards, AI did not always use the appropriate minimum score for a state to determine if a student has passed an exam.

b) Plaintiff discovered that AI was reporting to states that students passed a course, even when the student had not achieved the minimum passing score required by that state.

c) Plaintiff discovered that AI has known about this issue since 2020 or prior.

28. Discrepancies Between Testing Service Standards and AI Standards.

a) AI utilized a third-party testing service, Pearson, to administer the exams.

b) Plaintiff discovered that the minimum score for passing used by Pearson on some of the exams was different than the minimum score used by AI to determine if a student passed.

c) When Plaintiff inquired about this issue, she was told that it was a "don't ask, don't tell type of policy."

d) Plaintiff discovered that AI has known about this issue since 2020 or prior.

29. Failure To Adjust USPAP Minimum Passing Score.

a) Plaintiff discovered that AI was utilizing the incorrect minimum passing score for the USPAP exam.

b) The minimum passing score is supposed to be adjusted every one or two years, but AI did not always adjust it.

c) As a result of AI's actions, in some years, students who purportedly passed the USPAP exam had actually failed, and students who purportedly failed the USPAP exam had actually passed.

   d)  The students were never informed of their correct results.

   e)  Plaintiff discovered that incorrect results had been reported as far back as 2008.

30. Plaintiff reported the ongoing fraud to CEO John Udelhofen ("Udelhofen") in October 2024.

31. On or about October 15, 2014, Udelhofen held a meeting with Plaintiff and AI Board President Sandra Adomatis ("Adomatis") to discuss the issues discovered by Plaintiff.

32. Plaintiff was told by Udelhofen and Adomatis not to take any action or discuss the issues with anyone else.

33. On October 29, 2024, Plaintiff asked Udelhofen to remove her signature from student course completion certificates that were provided to students and state regulatory authorities, stating that she did not feel comfortable attesting that the certificates were accurate.

## AI's Retaliation Against Plaintiff

34. On October 22, 2024, at the direction of AI Vice President (and former AI President) Craig Steinley ("Steinley"), AI canceled Plaintiff's trip to a work-related conference. When Plaintiff told Udelhofen that she believed that the cancellation was punitive, Udelhofen told her he thought that she was correct.

35. On October 30, 2024, Udelhofen sent a text message to Plaintiff informing her that he was working on an employment separation "package" and asking if she needed outplacement assistance.

36. Plaintiff responded by asking if she was being fired.

37. Udelhofen responded "No. I'm trying to help you get out with some runway. My feeling is that Craig [Steinley] will make it hell for you as long as you stay."

6

38. On October 31, 2024, Plaintiff informed AI's Human Resources department of the October 22nd text message from Udelhofen and provided a list of the issues she had discovered.

39. At this juncture, Udelhofen began criticizing Plaintiff's work, reassigning responsibilities, and generally undermining Plaintiff's authority with her team.

40. On December 10, 2024, AI terminated Plaintiff's employment.

## Count I
## Illinois Whistleblower Act – 740 ILCS 174/1 et seq.

41. Plaintiff incorporates by reference all of the allegations set forth above in paragraphs 1 through 40.

42. Plaintiff was an employee of AI.

43. While employed by AI, Plaintiff discovered that AI was engaged in fraudulent conduct that violated state and federal law.

44. Plaintiff refused to engage in the fraudulent conduct.

45. As a result of Plaintiff's reporting of the fraudulent conduct and her refusal to engage in the fraudulent conduct, AI began making Plaintiff's life "hell" and was promptly terminated from her job.

46. As a result of AI's retaliation, Plaintiff has suffered damages including lost wages and benefits, pain and suffering, damage to her career, as well as other damages that are continuing to accrue.

## Count II
## Common Law Retaliatory Discharge

47. Plaintiff incorporates by reference all of the allegations set forth above in paragraphs 1 through 40.

48. Plaintiff was an employee of AI.

7

49. While employed by AI, Plaintiff discovered that AI was engaged in fraudulent conduct that violated state and federal law.

50. Plaintiff reasonably believed that the conduct she discovered violated state and federal law.

51. AI's termination of Plaintiff's employment violated a clear mandate of public policy.

52. Plaintiff reported the fraudulent conduct to AI's CEO, Board President, and Human Resources department.

53. Plaintiff refused to engage in the fraudulent conduct.

54. As a result of Plaintiff's reporting of the fraudulent conduct and her refusal to engage in the fraudulent conduct, AI began making Plaintiff's life "hell" and was promptly terminated from her job.

55. As a result of AI's retaliation, Plaintiff has suffered damages including lost wages and benefits, pain and suffering, emotional distress, damage to her career, as well as other damages that are continuing to accrue.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment in favor of Plaintiff and against Defendant,

    a. awarding backpay, front pay, and compensatory damages;

    b. awarding Plaintiff interest as provided by statute;

    c. awarding punitive damages in an amount to be determined at trial;

    d. awarding Plaintiff her reasonable attorneys' fees and costs; and

    e. granting Plaintiff such further relief as the Court deems proper.

## JURY DEMAND

Plaintiff demands trial by jury for all issues so triable.

Respectfully submitted,

**ALISSA AKINS**

By: /s Andrew R. Greene
      One of her attorneys

Andrew R. Greene
Litwin Kach LLP
401 N Michigan Ave.
Suite 1200
Chicago IL 60611
312.380.9917
andrew@litwinkach.com
ARDC #6225072

Jordan Matyas
1818
200 W. Monroe Street
Suite 2025
Chicago IL 60606
312.968.9600
jordan@1818legal.com
ARDC #6283478